**McELROY v. ELLEDGE et al.**

No. 9918.

Court of Civil Appeals of Texas. Galveston.

Feb. 27, 1934.

Rehearing Denied March 15, 1934.

A. D. Dyess and Paul Strong, both of Houston, for appellant.

**200**

Vinson, Elkins, Sweeton & Weems, of Houston, for appellees.

LANE, Justice.

T. K. McElroy brought this suit against Raymond P. Elledge and Vernon L. Elledge to recover the sum of $3,054.68 as damages, which he alleged he suffered by reason of a breach by defendants of a partnership agreement, which said agreement had been entered into between said parties, or, in the alternative, for a breach of an employment contract entered into between him and Raymond P. Elledge and Vernon Elledge.

Plaintiff alleged:

1. That in February, 1928, plaintiff became a member of the firm of Elledge, McElroy & Elledge, attorneys.

2. That preceding plaintiff's entry in said firm, his father, W. A. McElroy, organized the Houston Building & Loan Association while plaintiff was still in school.

3. That plaintiff's father, W. A. McElroy, had the operating contract for said Building & Loan Association, giving the said W. A. McElroy the entire control and management thereof.

4. That about the year 1925 said W. A. McElroy made an agreement with Raymond P. Elledge whereby he was made general attorney for said Building & Loan Association on a year to year contract, the compensation to be the fees which he would receive for the legal work of said association and its clients.

5. That said W. A. McElroy, father of plaintiff, acting as plaintiff's agent, informed Raymond P. Elledge, just before 1928, that plaintiff would soon finish his law course and be admitted to the practice of law and that he wanted it agreed and understood that the plaintiff, T. K. McElroy, upon his being admitted to the bar, should become associated with said Raymond P. and Vernon Elledge in the practice of law.

6. That Raymond P. Elledge agreed that plaintiff should become associated with said law firm under the firm name of Elledge, McElroy & Elledge, general attorneys for the Houston Building & Loan Association, and that plaintiff should be entitled to one-fourth of the net profits received by said firm as fees as general attorneys for said association.

7. That plaintiff, acting on said agreement, became a member of said firm.

8. That at the time of joining said firm it was agreed that Raymond P. Elledge had his own clients and that plaintiff should assist Raymond P. Elledge in attending to the business of the personal clients of Raymond P. Elledge, for which plaintiff was to receive no additional compensation; also, that plaintiff might have his own individual clients, the fees from which should be his own, unless he called in Raymond P. Elledge to assist him in said business. It was further agreed that business might come to the firm as firm business, in which event the fees therefrom should be shared on a reasonable and proper basis to be agreed upon at the time thereof.

9. In pursuance of said agreement, plaintiff received for the months of February to July, inclusive, 1928, as his one-fourth of the profits from the business of the Houston Building & Loan Association under said agreement, the sum of $1,950.07.

10. Prior to July 26, 1928, there was no firm business, save and except that of probating the Martin will.

11. That about June 1, 1928, negotiations were begun by the said association with the plaintiff's father, W. A. McElroy, for the purchase of the operating contract owned by the said W. A. McElroy. That W. A. McElroy at the time thereof asked Raymond P. Elledge what effect the sale of his contract would have on the attorneyship contract of T. K. McElroy, to which Raymond P. Elledge replied, "Absolutely none."

12. That plaintiff himself asked Raymond P. Elledge what effect the surrender of the contract would have upon his status as attorney, and was told that it would be unchanged; that plaintiff's work had been satisfactory; but that Raymond P. Elledge thought it should be agreed that they increase the salary paid to his brother, Vernon L. Elledge, on January 1st, succeeding, to which suggestion plaintiff agreed.

13. Thereafter W. A. McElroy sold the operating contract of said Building & Loan Association.

14. About July 15, 1928, Mr. W. S. Martin, of Port Arthur, Tex., employed the firm of Elledge, McElroy & Elledge to probate the will of the father of W. S. Martin, which plaintiff accepted in behalf of said firm and discussed with Raymond P. Elledge. The filing of such will for probate was not immediately called to the attention of Raymond P. Elledge; whereupon, learning of same, he accused plaintiff of disloyalty and stated that the firm was thereupon dissolved and plaintiff discharged.

15. Plaintiff further alleged the issue of

the partnership earnings from the time of his discharge and that they averaged $325 per month.

16. That plaintiff was wrongfully discharged and excluded from participation in the partnership earnings and profits; that such exclusion was wrongful and without justification.

17. Plaintiff further alleged that Raymond P. Elledge was elected annually general attorney for said Building & Loan Association, and that it was anticipated and agreed that plaintiff's connection would continue and remain in force throughout the contract year during which Raymond P. Elledge was general attorney for said association, and in connection therewith alleged that as consideration to Raymond P. Elledge for the admission of plaintiff, T. K. McElroy, into such firm, W. A. McElroy agreed to turn over to said attorneys $5 additional for each matter transacted for the Building & Loan Association.

18. That the term of such partnership was for one year.

19. That plaintiff endeavored to mitigate his damage, and that his earnings for the months of August to December, 1928, inclusive, were the sum of $172, and that his earnings from January to July, 1929, inclusive, were the sum of $873.90.

20. That plaintiff's damage by reason of such breach and the loss of his profits therefrom was the sum of $2,854.68, and that in addition thereto plaintiff is damaged through the loss of one-third part of the Martin will probate fee of $400.

21. Plaintiff prayed that the partnership be dissolved, for an accounting and settlement thereof, and for judgment for his part of the net profits and fees, for costs of suit and general relief, and, in the alternative, in case it should be held that plaintiff was an employee only, for like damages, for breach of contract of employment, and general relief.

Defendants answered by general demurrer, general denial, and by specially alleging:

That when plaintiff became associated with the firm of Elledge, McElroy & Elledge it was understood he was not to participate in any of the personal business of the defendants; that he was only to receive his portion of the fees from the Building & Loan Association and his personal fees; that it was expressly agreed that plaintiff should not attempt to control any of the personal business of Raymond P. Elledge; that the handling of the estate of W. A. Martin, deceased, was personal business of Raymond P. Elledge, and was so known to plaintiff; that plaintiff solicited the probate of the will of W. A. Martin for himself and attempted to induce the executor thereof to give the business to him and agree to let him participate in the handling thereof and distribution of the fee therefrom; that such acts of plaintiff were without the knowledge or consent of Raymond P. Elledge; that plaintiff proceeded to handle the probate of the Martin will as a firm matter; that such acts of plaintiff were discovered by Raymond P. Elledge on July 26, 1928, and when the matter was mentioned by Elledge to plaintiff, the latter stated he expected to participate in the fee from the handling of such business, that such business came to the firm of Elledge, McElroy & Elledge as firm business, and that the executor of the estate had stated that the fee was to be divided between plaintiff and defendants in equal proportions; that thereupon Raymond P. Elledge made inquiry and ascertained from Mr. W. S. Martin, said executor, that such business was intended as the personal business of Raymond P. Elledge; that by reason of the foregoing allegations the defendants were justified in dissolving said firm. Defendants prayed that they go hence without day.

By supplemental petition plaintiff denied generally the allegations of defendants' answer.

The case went to trial on the 11th day of July, 1932, before a jury, and the court proceeded to hear the evidence offered.

It was shown that prior to January, 1928, and for some time thereafter, W. A. McElroy, father of the plaintiff, T. K. McElroy, had entire control and management of the affairs of the Houston Building & Loan Association, which he had theretofore organized; that defendant Raymond P. Elledge was appointed and elected attorney for the said Building & Loan Association by W. A. McElroy, and by virtue of an agreement had with said McElroy, whereby said Elledge was to receive $20 as attorney's fee for each contract or loan handled by said association, to be paid out of each $25 fee collected by the association from its members and clients, and whereby it was agreed, at the inception of such agreement, that at some time in the future, plaintiff, T. K. McElroy, was to come into the legal department of the Houston Building & Loan Association and share in the fees paid by said association to said legal department.

It is shown that Raymond P. Elledge was appointed and elected general attorney to handle the legal business affairs of said association year by year from the 1st day of January to the 31st day of December, for some years prior to the year 1928, and that during the year 1927, W. A. McElroy, general manager of the affairs of said association, discussed with Raymond P. Elledge the association of his son, T. K. McElroy, with him (Raymond P. Elledge), and in which discussion said Elledge agreed that such association could be arranged; it is shown that during the latter part of December, 1927, and before the appointment and election of Raymond P. Elledge as said general attorney for 1928, W. A. McElroy again discussed with Raymond P. Elledge and also his brother, Vernon Elledge, who was working with Raymond P. Elledge on a salary, and it was then agreed between W. A. McElroy, acting for the plaintiff, T. K. McElroy, and Raymond P. Elledge, that he (Elledge) should get $5 additional out of the fees paid into the Building Association by its members and clients, in order to pay to plaintiff, T. K. McElroy, one-fourth of the net profits of the fees derived from the association, and that in consideration of such agreement on the part of Raymond P. Elledge, he and Vernon Elledge agreed to associate T. K. McElroy with themselves under the firm name of Elledge, McElroy & Elledge. It is shown that shortly after such agreement was entered into it was confirmed between Raymond P. Elledge and T. K. McElroy, and in pursuance of such confirmation plaintiff, T. K. McElroy, was taken into association with Raymond P. Elledge about February 1, 1928, under the firm name of Elledge, McElroy & Elledge. It is shown T. K. McElroy worked in said firm and was paid 25 per cent. of the fees received from the Building Association, that being his part of such fees agreed upon by the parties up to the month of July, 1928. It is shown that in June, 1928, W. A. McElroy, who organized the Building Association and who was its general manager, contemplated selling his operating contract back to the association, and inquired of Raymond P. Elledge what effect such sale if made would have on T. K. McElroy's association with him (Elledge). To which inquiry he was told that such sale would in no way affect such association. Later the plaintiff, T. K. McElroy, made a similar inquiry of Raymond P. Elledge and received the same answer given his father, except at that time Raymond P. Elledge said that Vernon Elledge's salary should be raised at the end of the year, to which T. K. McElroy agreed, it having been agreed between W. A. McElroy, manager, and Raymond P. Elledge that he (Elledge) should get $5 additional out of the fees to be paid by the Building Association in order to enable him to pay T. K. McElroy 25 per cent. of the net profits of the fees received from the Building Association.

As already stated, it is shown that T. K. McElroy entered said firm and performed the services required of him by the firm and that he was paid his 25 per cent. of the fees received from the Building Association up to the month of July, 1928.

Raymond P. Elledge testified that the only difference he had with T. K. McElroy prior to the dissolution or attempted dissolution of the firm of Elledge, McElroy & Elledge was concerning a fee of $300 to be paid for services to be rendered in the probate of the will of W. A. Martin, deceased, who before his death was president of the Martin Lumber Company of Port Arthur. He testified that both Mr. Martin and his son, W. S. Martin, were very well known to him; that W. S. Martin is generally known as Stewart Martin; that Stewart conducted the business affairs of the Martin Lumber Company and came into contact with witness quite often; that because of the fact the Houston Building & Loan Association financed a number of loans on which the paper was owned by Martin Lumber Company. "I also handled not only the character of work which is done in connection with the association loans, but I handled over a period of a year, or more, a number of matters which were not connected with the business of the Houston Building & Loan Association." Mr. R. R. Stafford, Jr., was his brother-in-law and was an officer also of the Martin Lumber Company, and Mr. Joe Stroud was secretary of the Martin Lumber Company. "Some time in the early part of July, the date I do not recall, Mr. T. K. McElroy came into the office where my brother and I were, at least we were both there at the time of the conversation, and stated that he had secured a piece of business for us from W. S. Martin, Mr. Stewart Martin. I heard nothing further about it, that is, we were to be employed. He said we, meaning himself and my brother and myself. He used the word firm, and the individuals also, because of the fact that he stated the nature of the employment was such that in order to divide the fee, whatever fee was to be secured from this considerable estate, one-third to himself, one-third to my brother and one-third to me. I heard nothing further of the matter until

about July the 25th, when I received a letter from the clerk at Beaumont stating that the application for the probation of the will had been filed and that advertisement had been had and that it was subject now to proof. That was the first time I learned that we even had the will of W. A. Martin, deceased."

He testified that T. K. McElroy did not show him the will of Martin and tell him that he had received it for probate; that the only thing that he knew from him was he had gone to Port Arthur and had talked with Stewart Martin, and that Mr. Martin had told him that he wanted "us" to probate the will and to divide the fee, one-third to him, one-third to Vernon Elledge, and one-third to him (Raymond Elledge); that he received notice from the clerk of the probate court, addressed to the firm of Elledge, McElroy & Elledge, which stated that the application for the probate of the will had been received and filed and that notices had been published; that upon receipt of such notice, he, thinking there was something wrong with it, went to Port Arthur on July 26th in order to ascertain from Stewart Martin what the facts were concerning the matter, and why he had not been advised about the probate of the will; that as soon as he returned to Houston he told T. K. McElroy that because of his act in seeking to secure a part of the fee in the probate of the Martin will, to which he was not entitled, and the attitude of the officers and directors of the Building Association, by whom he (the witness) was employed, that it would be necessary to dispense with his services and that the partnership was dissolved. He testified that T. K. McElroy asked him if the witness had any other complaint to make about any other matter of work, and that he told him that work other than that concerning the Martin will was satisfactory.

Testifying further, the witness said that his understanding had with W. A. McElroy, as to what T. K. McElroy was to receive from the firm, was that he was to receive 25 per cent. of the net amount of money after payment of all expenses incurred in conducting the legal business which he had or which he got after the firm was formed; but that it was understood that neither Vernon Elledge nor T. K. McElroy would have any interest in his individual business which he had at the time, composed of several retainers, nor in any business secured in the future as a result of his own effort or resulting from friends giving or sending him business; that they had no agreement as to the division of moneys coming from firm business; that there was no agreement as to how long this partnership was to continue. Testifying further, he said that T. K. McElroy did see him about the first of July, possibly three or four weeks before he was notified that the Martin will had been filed for probate, and told him that he had been to Port Arthur and that "we" (meaning the firm) were to get the business of probating the Martin will; that on the day a Mr. Stroud, a spokesman for Stewart Martin, was in Houston and asked McElroy to go to Port Arthur to get the Martin will, he was out of the city; that after McElroy got back from Port Arthur he told him that they were going to get the Martin will to probate and that he said to McElroy that if "we got the business it would be a nice piece of business and a nice fee should be paid"; that McElroy prepared the application for the probate of the will and on such application he (witness) had the same probated.

T. K. McElroy testified that during the Christmas holidays of 1927 he had a discussion with Mr. Elledge relative to the witness becoming associated with him on the basis that the witness was to come into his office in the latter part of January, 1928; that it was agreed that his compensation for his services was to be 25 per cent. of the net fees coming to the firm of the Houston Building & Loan Association; that all the business that came to him personally was to be his personally, no one else to share in it; that it was agreed that any business that came to Mr. Elledge personally was to be his and that the witness was to have nothing to do with it, but that a fee which should come to the firm should be a matter for agreement at that time; and that upon that basis he became associated with Mr. Elledge.

Testifying further, the witness said that at the time his father, W. A. McElroy, contemplated selling his interest in the Building & Loan Association, he asked Mr. Elledge what effect such sale if made would have on his status with him, and he said that it would have none, that his (the witness') services had been satisfactory and so far as he was concerned it would remain unchanged, except he thought they should agree to increase his brother's salary at the *end of the year*, and that he agreed to that. (Italics ours.) Testifying further, he said that about the middle of July, 1928, Mr. Stroud, secretary of the Martin Lumber Company in Port Arthur, came into the office of his firm and came to see him. (Upon objection by counsel for Elledge he was not permitted to state what was the conversation he had with Stroud.) At this point counsel for McElroy sought to in-

troduce in evidence a letter from Stewart Martin to W. A. McElroy, showing that he (Martin) had sent Stroud to Houston to see McElroy, which letter was excluded on objection of counsel for Elledge.

The witness testified that he first heard of the Martin will about the first of July, 1928, at that time Mr. Stroud, secretary of the Martin Lumber Company, came into the office and said that Stewart Martin had sent him over to have one of us come over and get his father's will for probate and that he (witness) told Stroud that he would go to Port Arthur the first thing the next day and that he did go the next day to Port Arthur; that when Stroud came to the office Mr. Elledge was not in the office; that when he got to Port Arthur he saw Stewart Martin; and testifying further he said: "I told him that Mr. Joe Stroud had asked me to come over to see about probating his father's will and he said yes, that that was so, and he got the will and we discussed it there together. I asked him the probable value of the estate and he said he hadn't had time to make an estimate of it but that he would do so, and that is all we discussed at that time, except matters of a friendly nature, until I got ready to leave, and as he walked to the door with me I asked him how he wanted that will handled, whether he wanted Mr. Elledge to handle it personally or for it to come to the firm, and he said that he thought he was hiring the firm to probate the will and that he did not expect any particular man to do it, that it was his idea and thought that he was employing the firm."

Raymond P. Elledge, being recalled, testified that after the will had been filed for probate he went to Port Arthur to see Stewart Martin and had a discussion with him in regard to this probate of the will, the prospect of employment, and under what arrangement the will was to be probated. Testifying further he said:

"When I was in Port Arthur I talked to Mr. Stewart Martin, told him the circumstances which I knew, which was that Mr. Killian McElroy had come back from Port Arthur during the early part of July, or latter part of June, and stated that he was to give us the probate of the will. I told him also that I had heard nothing further from it until on the day before when I learned from the clerk at Beaumont that the will had been filed for probate without my knowledge.

"And that the first I knew of the fact that the will was in our possession or in the possession of anyone of the three associated was when I received the letter from Beaumont. I asked him at that time what Mr. Killian McElroy had said to him when he came to Beaumont and when the will was delivered to him and Mr. Martin stated that he delivered the will to him at the time he was in Port Arthur, that being his place of business during the early part of the month. He further stated that he had talked to Mr. Killian McElroy about the probate of the will, and the fact that a detailed inventory of the estate of W. A. Martin, deceased, was to be made, for the purpose of checking notes and real estate; that he had delivered the will and told him that he wanted the will probated at once. He further stated that Mr. McElroy told him that on business of this nature that unless it came by reason of his own efforts, or came to him, that he would have no interest in it, no interest in the fee, and that he wanted to know from Mr. Martin if the will was to be handled so that he could get an interest in the fee, that he thought he was entitled to a one-third interest in the fee to be paid, whatever it was. Mr. Martin told him, according to his statement to me, that he was not interested in how we divided any fee whatsoever; that he had nothing to do with that, would not attempt to tell me how to prorate a fee among myself and my associates; that he was sending the business to me because of the fact that I had been his friend and attorney and that he expected me, if not personally, to handle it or supervise it, and that he would hold me entirely responsible for the manner in which it was handled and the results obtained."

That Martin told him that he had sent Stroud to Houston for the purpose of transacting some business with the association, and at the same time for the purpose of seeing him (Elledge) in order that he might come to Port Arthur and discuss with him the probate of the will.

The plaintiff, T. K. McElroy, introduced in evidence a letter from W. S. (Stewart) Martin to W. A. McElroy, father of plaintiff, which reads as follows:

"Dear Mr. McElroy:

"I am very sorry indeed that the matter of handling my father's estate with the firm of Elledge, McElroy and Elledge has taken the turn that it has. At my father's death I decided to employ this firm in view of the fact that I was better acquainted with them than any Beaumont lawyers and felt sure the estate would receive the best of attention from this firm due to other business relations.

"It is very regrettable that this matter

should come up at the same time the change in the management of the Houston Building & Loan Assn. took place.

"I told Mr. Stroud when he went to Houston to have some member of the firm come over here and get what necessary information they needed to file the will for probate. Your son, Killian, came over and in my office asked me if I wanted him or the firm to handle this matter. I explained to him very definitely that it was to be handled by the entire firm and as to the question as to the fees and how they were to be handled, that was left up to individual members of the firm to decide among themselves.

"I feel sure when Killian left my office that he knew the firm of Elledge, McElroy & Elledge was handling the estate. In fact in my conversation with Mr. Elledge the other day he also was told by Mr. McElroy that my wishes were for the firm to handle it.

"If you will allow me to offer my opinion of the trouble in the office, I think that Mr. Elledge was very much displeased that Mr. McElroy had taken it on himself to file the will for probate without passing it on to him for his approval in view of the fact that he was the senior member of the firm and furthermore I think after you left the Houston Building & Loan Assn. it would have been very hard for your son to have pleased the other members of this law firm.

"As I said in the beginning it is very regrettable indeed that the writer happens to be a party to this little unpleasant mix-up and I want to assure you that we regret it very much and have always had the kindest of feelings toward you and, while the writer has not known your son personally, it was friendship for you that caused me to place this business with the firm so that he would participate in it.

"I hope that you will handle this information strictly confidential as the writer does not care to be a party to any unpleasantness over this occurrence.

"Very truly yours,     W. S. Martin."

We have gathered the foregoing facts and testimony from a voluminous statement of facts, in question and answer form. We have not stated all the testimony of the witnesses, but we think the statement made contains all facts and testimony pertinent to the issues raised by this appeal. Upon the pleadings, the facts, and testimony, the trial court instructed a verdict for defendants, Raymond P. Elledge and Vernon L. Elledge. Upon such verdict being returned, the court rendered judgment decreeing that plaintiff, T. K. McElroy, take nothing by his suit and that the defendants go hence without day, etc.

T. K. McElroy has appealed.

Appellant contends for reversal of the judgment that there was ample evidence to support all issues raised by his pleading: (1) The making the contract of partnership or employment; (2) that the duration of such partnership was, by the express agreement of the parties forming the same, or by implication, from about the first day of February, 1928, to the 31st day of December of the same year; (3) that appellees had wrongfully breached the contract of partnership; and (4) the damages suffered by appellant by reason of such breach of said contract. Therefore, the trial court erred in instructing a verdict for appellees.

We sustain all of appellant's contentions:

■ The appellees' defense was not established as a matter of law, there being a conflict in the evidence as to whether appellant breached this contract by attempting to secure for the firm the individual business of the appellee Raymond P. Elledge; the appellee Raymond P. Elledge testifying that the probate of the Martin will was his individual business, and the appellant T. K. McElroy testifying that the probate of the Martin will was firm business.

The letter from Martin to W. A. McElroy introduced in evidence shows clearly that Martin turned the will of his father over to plaintiff, T. K. McElroy, for probate, as firm business. In such letter it is so declared.

Appellee Raymond P. Elledge testified that the sole reason for appellant's discharge was that he, in his acts in undertaking to procure the probate of the Martin will as firm business, violated the terms of partnership agreement and that otherwise appellant's services and association were entirely satisfactory.

Such conflicting evidence made the issues, raised by the pleadings of the parties, question for the determination of the jury. We therefore conclude that the trial court committed reversible error in instructing a verdict for appellees.

■ It is well settled that the refusal of the trial court to submit the case to a jury chosen to try the same is error when the evidence as to the issues raised is conflicting.

The judgment is reversed, and the cause is remanded.

Reversed and remanded.